**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

FRUTH, INC.,

Plaintiff,

v. CIVIL ACTION NO. 2:25-cv-00751

OPTUMRX, INC., et al.,

Defendants.

# MEMORANDUM OPINION AND ORDER

Pending before the Court are multiple outstanding motions filed by Plaintiff Fruth, Inc. ("Plaintiff"); Defendant OptumRX, Inc. ("Optum"); Defendant Caremark, L.L.C. and Defendant CaremarkPCS Health, L.C.C. (collectively, "Caremark"); and Defendant Express Scripts, Inc. ("Express Scripts"). For the reasons discussed below, the Court **GRANTS** Optum and Caremark's motions to compel arbitration, (ECF Nos. 12, 14), and further **GRANTS** Express Scripts's Motion to Sever and Transfer Claims, (ECF No. 28).[1]

## *I. BACKGROUND*

Plaintiff is a Pharmacy located in West Virginia.[2] (ECF No. 38-1 at 1, ¶ 1.) Defendants Caremark, Optum, and Express Scripts are Pharmacy Benefits Managers ("PBMs"), licensed to

[1] Also Pending are Caremark's motion to file Exhibit A under seal, (ECF No. 16), and Plaintiff's motions for leave to exceed the page limitation, (ECF Nos. 33, 40). These motions are **GRANTED**. Further, Optum and Caremark's joint objections, (ECF No. 61), and Plaintiff's objections, (ECF No. 64), are **OVERRULED AS MOOT**, and the motion to stay, (ECF No. 59), is **DENIED AS MOOT**.
[2] Plaintiff filed an unopposed motion for leave to amend its Complaint. (ECF No. 38.) This Motion is **GRANTED**.

conduct business in West Virginia. (*Id.* at ¶¶ 2–4.) This action arises out of Plaintiff's reimbursement dealings with the Defendants for "prescription drugs and/or pharmacy services." (*See generally id.*)

PBMs contract "with network pharmacies, either directly or through a [pharmacy services administrative organization ("PSAO")]" for reimbursement of "prescription drugs and other items." (ECF No. 12-1 at 2, ¶ 4.) "When a network pharmacy fills a prescription for a member, it submits a claim for that prescription to [PBMs], which adjudicate[] the claims and later pay[] the pharmacy according to the terms of their contract." (*Id.*) As PBMs, Optum, Caremark, and Express Scripts provide these services to Plaintiff. (*See generally* ECF No. 38-1.)

The West Virginia Pharmacy Audit Integrity Act ("the Act"), regulates, *inter alia*, PBMs. (*Id.* at 4, ¶ 16; *see also* W. Va. Code § 33-51-2). In 2021, the West Virginia Legislature added an amendment to the Act, which Plaintiff alleges prohibits PBMs from reimbursing a pharmacy for a prescription or service "without including a 'professional dispensing fee of $10.49.'" (ECF No. 38-1 at 4, ¶ 21 (quoting W. Va. Code § 33-51-9(e)).) This amendment also allegedly prohibits PBMs from reimbursing a pharmacy "in an amount less than [a PBM] reimburses itself" for the same prescription or service. (*Id.* at ¶ 19 (quoting W. Va. Code § 33-51-9(f)).) Since the Act's amendment in 2021, the Defendants allegedly "engaged in an illegal scheme to violate" the Act by repeatedly failing to provide Plaintiff and putative class members with a professional dispensing fee of $10.49 and reimbursing their own pharmacies at higher rates than they reimbursed Plaintiff. (*Id.* at 5, ¶ 23–24.) Plaintiff further alleges that "each Defendant imposed unconscionable adhesive contracts" for the purpose of violating the act and concealing the violations from Plaintiff and putative class members. (*Id.* at 6, ¶ 31.)

Consequently, on December 23, 2025, Plaintiff filed suit against Defendants in this Court. (*See generally* ECF No. 1.) Plaintiff's Complaint asserts three Counts. Count One alleges violation of the Act under W. Va. Code § 33-51-9(f); Count Two alleges violation of the Act under W. Va. Code § 33-51-9(e); and Count Three seeks Declaratory judgment under 28 U.S.C. § 2201. (ECF No. 38-1 at 9–11, ¶¶ 47–58.) Plaintiff also seeks class certification under Rule 23 of the Federal Rules of Civil Procedure. (*Id.* at 11–14, ¶¶ 59–68.)

Optum and Caremark then filed the pending motions to compel arbitration. (ECF Nos. 12, 14.) Plaintiff filed its responses, (ECF No. 33), and Optum and Caremark filed their combined reply, (ECF No. 36). Additionally, Express Scripts filed a motion to sever and transfer claims, (ECF No. 28), to which Plaintiff responded, (ECF No. 40), and Express Scripts replied, (ECF No. 49). As such, these matters are fully briefed and ripe for adjudication.

## *II. LEGAL STANDARD*

In considering a motion to compel arbitration, the Court applies a summary judgment standard when it must consider documents outside of the pleadings. *See Rowland v. Sandy Morris Fin. & Est. Planning Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021); *see also Duncan v. Riverside Health & Rehab. LLC*, 2024 WL 2402051, at *3 (S.D. W. Va. May 23, 2024) (Johnston, C.J.) (discussing the applicable legal standard).

Summary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In resolving motions for summary judgment, the moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter

of law. *Celotex Corp.*, 477 U.S. at 322–23. "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists where the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). The Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## *III. DISCUSSION*

The Court first addresses Optum and Caremark's motions to compel arbitration, (ECF Nos. 12, 14), followed by Express Scripts's motion to sever and transfer claims, (ECF No. 28).[3]

### *A. Motions to Compel Arbitration*

Section 2 of the Federal Arbitration Act ("FAA") "is the primary substantive provision of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Section 2 provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity

[3] Notably, the facts and issues in this case do not exist in isolation. The Honorable Thomas S. Kleeh, Chief Judge on the United States District Court for the Northern District of West Virginia, resolved a similar case involving the same Defendants, issues, and motions. *See Waterfront Fam. Pharmacy LLC v. Optumrx, Inc.*, No. 1:25-CV-29, 2026 WL 880157 (N.D.W. Va. Mar. 31, 2026). Although the case involved a different plaintiff, that plaintiff, like Plaintiff here, was a pharmacy represented by Plaintiff's current counsel. *Id.* In that case, Judge Kleeh granted Optum and Caremark's motions to compel and Express Scripts's motion to sever and transfer claims. *Id.* As discussed below, this Court follows its learned colleague to the north and makes similar findings.

for the revocation of any contract." 9 U.S.C. § 2. Enacted "to reverse the longstanding judicial hostility to arbitration agreements," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991), § 2 thus "places arbitration agreements on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006), by "requir[ing] courts to 'enforce arbitration agreements according to their terms.'" *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019) (internal quotation marks omitted) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018)).

Courts have long interpreted the FAA as "reflect[ing] 'a liberal federal policy favoring arbitration agreements.'" *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (quoting *Moses H. Cone*, 460 U.S. at 24); *see, e.g., Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir. 1996) ("[T]he Supreme Court has announced its healthy regard for the federal policy favoring arbitration.") (internal quotation marks omitted). Thus, although courts now enforce arbitration agreements "accord[ing] [to] their terms," *Volt Info. Scis. Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989), "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292 (4th Cir. 2020) (quoting *Moses H. Cone*, 460 U.S. at 24–25).

Section 3 entitles "litigants already in federal court to invoke [arbitration] agreements made enforceable by § 2." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009). Litigants do so by moving the Court "to stay judicial proceedings involving issues covered by written arbitration agreements." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709 (4th Cir. 2001). Section 3 thus requires courts "to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Adkins*, 303

F.3d at 500. In other words, the "stay-of-litigation provision is mandatory." *Id.* Litigants wishing to compel arbitration under the FAA must prove

> (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

*Id.* at 500–01 (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)).

To determine if an arbitration clause is valid, courts look to the contract formation law of the forum state. *Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 569 (4th Cir. 1998). Once the arbitration clause is deemed valid, the breadth and scope of the clause are governed by the "federal substantive law of arbitrability." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 n.4 (4th Cir. 2000). After the court decides that a particular dispute is covered by an arbitration clause, the court may not proceed to consider the merits of the case and must immediately send the case to arbitration. *Adkins v. Labor Ready, Inc.*, 185 F. Supp. 2d 628, 634 (S.D. W. Va. 2001) (Copenhaver, J.) (citing *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986)). "[W]e leave all questions concerning the scope of an arbitration agreement to the arbitrator, 'unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Winston-Salem Mailers Union 133 CWA v. Media Gen. Operations, Inc.*, 55 Fed. App'x 128, 133 (4th Cir. 2003) (per curiam) (citing *AT&T Techs.*, 475 U.S. at 650).

1. Optum's Motion to Compel

As an initial matter, Optum argues that California law governs the determination of whether Plaintiff's claims must be arbitrated. (ECF No. 13 at 8.) Then, Optum argues that all four *Adkins* elements are met. (*Id.* at 8–12.) Lastly, Optum argues that the arbitration agreement

delegates threshold issues of arbitrability, including unconscionability and scope, to an arbitrator. (*Id.* at 12–15.) Plaintiff, however, argues that the delegation provision is unenforceable because, combined with the choice of law provision, "(1) it operates as a prospective waiver of [Plaintiff's] substantive West Virginia statutory rights; (2) is contained in illegal contracts that violate West Virginia public policy; (3) it violates West Virginia public policy; and (4) it is procedurally and substantively unconscionable." (ECF No. 33-1 at 5.) For the reasons discussed below, the Court agrees with Optum.

*i. Choice of law*

In determining whether to enforce a contractual choice of law provision or apply some other law, this Court applies the choice of law rules of West Virginia, the state in which this Court sits. *See Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652–53 (4th Cir. 2010) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). The West Virginia Supreme Court of Appeals ("WVSCA") recognizes "the presumptive validity" of a choice of law provision. *Manville Personal Injury Settlement Trust v. Blankenship*, 749 S.E.2d 329, 336 (W. Va. 2013). Consequently, in West Virginia, a choice of law provision governs the enforceability of an arbitration agreement "(1) unless the provision bears no substantial relationship to the chosen jurisdiction or (2) the application of the laws of the chosen jurisdiction would offend the public policy of this State." *Id.*; *see also W. Va. CVS Pharm., LLC v. McDowell Pharm.*, 796 S.E.2d 574, 580 (W. Va. 2017) (applying state choice of law provision to determine enforceability of arbitration agreement).

Here, the choice of law provision contained in the Pharmacy Network Agreement ("PNA"), between Optum and Plaintiff states "[t]his agreement and the rights and obligations of

the parties hereunder shall be governed by and construed in accordance with the laws of California, without giving effect to the conflict of law principles thereof." (ECF No. 12-2 at 22, § 11.11.) This agreement bears a substantial relationship to California because Optum is incorporated in California, (ECF No. 38-1 at 2, ¶ 2), has "substantial operations in California[,]" (ECF No. 12-1 at 2), and under the PNA, all notices Plaintiff sent to Optum had to be sent to a California address, (ECF No. 12-2 at 20, § 11.4). Further, applying California law does not offend the public policy of West Virginia because, as discussed below, the outcome is the same under West Virginia's "direct benefits estoppel" doctrine. Thus, California law applies to this Court's determination of whether the parties are bound by a valid arbitration agreement.[4]

*ii. The* Adkins *Elements*

The parties dispute only the second *Adkins* element, which requires Optum to prove the existence of "a written agreement that includes an arbitration provision which purports to cover the dispute." *Adkins*, 303 F.3d at 500-01; *see also* ECF No. 33-1 at 3; ECF No. 13 at 8. Optum argues that the second element is satisfied under agency theory and the doctrines of incorporation by reference, direct benefits estoppel, and ratification. (ECF No. 13 at 8–12.) The Court agrees.

Starting with the agency theory, an agent may enter an arbitration agreement on behalf of its principal, even if the principal does not sign the agreement to arbitrate. *See Matthau v. Superior Court*, 151 Cal. App. 4th 593, 599 (2007). "Appointment of a PSAO as a pharmacy's contracting agent is standard in the industry . . . and courts regularly enforce against pharmacy-PSAO-members contracts entered into by the PSAOs representing those pharmacies."

---

[4] To be clear, the Court *only* finds that California law applies to this Court's determination of the *enforceability* of the arbitration agreement. The Court makes no findings as to whether California law applies to the arbitrator's determination of Plaintiff's claims.

*Waterfront*, 2026 WL 880157, at *8 (citing *AAMH Pharm. Inc. v. OptumRx Inc.*, No. 56-2018-00515296-CU-AT-VTA, 2019 WL 13152208, at *5 (Cal. Super. Ct. Apr. 22, 2019)); *see also Wholesale All., LLC v. Express Scripts, Inc.*, 366 F. Supp. 3d 1069, 1073 (E.D. Mo. 2019) ("Rather than negotiate these contracts with the PBMs themselves, many pharmacies—including roughly 80% of the 22,000 independent pharmacies in the United States—outsource this negotiation and other administrative tasks to PSAOs.")

Here, Plaintiff used Leader Drug Stores, Inc. dba Managed Care Connection ("Leader Drug Stores") to act as its PSAO and enter certain contracts with PBMs on its behalf. (ECF No. 12-1 at 3, 6 ¶¶ 11, 20.) In 2015, Leader Drug Stores executed the PNA with Optum "on behalf of" itself *and* each of its member pharmacies, including Plaintiff. (ECF No. 12-2 at 1; ECF No. 12-1 at 6, ¶ 20.) In other words, Leader Drug Stores acted as Plaintiff's agent. "[W]hen Waterfront joined [the pharmacy network], it became one of the pharmacies for whose benefit and on whose behalf the PNA was executed." *Waterfront*, 2026 WL 880157, at *7. As a result, Plaintiff joined Optum's pharmacy network and "knowingly availed itself" of the PNA. *Id.* at *7. Thus, Plaintiff is bound by the PNA under the doctrine of agency theory.

Turning to the doctrine of incorporation by reference, "[u]nder California law, parties may validly incorporate by reference into their contract the terms of another document." *Baker v. Aubry*, 216 Cal. App. 3d 1259, 1264 (1989). Of course, the contract must clearly and unequivocally reference the incorporated document and the "the terms of the incorporated document must be known or easily available to the contracting parties." *Slaught v. Bencomo Roofing Co.*, 25 Cal. App. 4th 744, 749 (1994).

Here, pursuant to the PNA, "[t]he *Pharmacy Manual* and all such addenda, exhibits and schedules, as the same may be amended from time to time, *are incorporated herein by reference and made a part hereof*." (ECF No. 12-2 at 19, § 11.1 (emphasis added).) As demonstrated by this language, the PNA clearly and unequivocally references the Pharmacy Manual. Plaintiff could easily access the terms of this manual online. (ECF No. 12-1 at 5, ¶ 16.) The Pharmacy Manual contains an arbitration agreement, which states that "[t]he parties agree to . . . resolve any and all Disputes" by "engag[ing] in good faith discussions"[5] but "[i]n the event the parties are still unable to resolve the Dispute, either party may commence arbitration."[6] (ECF No. 12-16 § L.) Accordingly, Plaintiff is bound by this arbitration agreement contained in the Pharmacy Manual, which the parties incorporated by reference into the PNA. The doctrines of direct benefits estoppel and ratification produce the same result.

Lastly, "[d]irect benefits estoppel applies to 'non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract.'" *Waterfront*, 2026 WL 880157, at *8 (citing *Bayles v. Evans*, 842 S.E.2d 235, 245–46 (W. Va. 2020)). Here, Plaintiff embraced the contract by filing at least "97,000 claims" to Optum and receiving "over $6 million in reimbursements from Optum." (ECF No. 12-17 at 2, ¶ 5.) Plaintiff cannot both *reap* the benefits of the Pharmacy Manual and simultaneously *avoid* its terms. *Waterfront*, 2026 WL 880157, at *8. Such a result would produce impermissible "cherry-picking." *See Bayles*, 842 S.E.2d at 245.

[5] Plaintiff's filing of this lawsuit shows that the parties are well past the phase of good faith discussions and should now engage in arbitration.

[6] Disputes are defined as "any and all issues, disputes, and/or controversies between the parties, including, but not limited to all disputes relating in any way to the parties' relationship, the terms of the Provider Network Agreement ("Agreement") and/or or this PM, and the Pharmacy Provider's status in the Administrator's network." (ECF No. 12-16 § L.)

Likewise, Plaintiff continued to submit claims and accepted reimbursement for those claims even after having easy access to the Pharmacy Manual on the internet and receiving at least one direct notice of changes to the Pharmacy Manual. (ECF No. 12-1 at 5, ¶¶ 16–17.) In doing so, Plaintiff ratified the Manual. *See Waterfront*, 2026 WL 880157, at *8.

Thus, Plaintiff is bound by the arbitration provision in the Pharmacy Manual.

*iii. The Scope of the Arbitration Agreement*

Optum argues that the Pharmacy Manual delegates all issues of arbitrability to an arbitrator, including unconscionability. (ECF No. 13 at 12; *see also id.* n.6 (quoting ECF No. 12-2 § 10.1).)

Generally, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69–70 (2010). Indeed, parties may agree to delegate controversies over the unconscionability of the entire agreement to an arbitrator. *Id.* An agreement to arbitrate functions as an "additional, antecedent agreement" that a federal court may enforce, and "the FAA operates on this additional arbitration agreement just as it does any other." *Id.* at 70. Still, the parties must delegate these gateway questions of arbitrability "by 'clear and unmistakable' evidence." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

Here, Plaintiff does not argue that the delegation provision itself is unenforceable. Instead, Plaintiff's arguments focus on the "gateway" issue of the unconscionability of the *entire* agreement. *See Rent-A-Center*, 561 U.S. at 69–70. As prescribed by the delegation clause in the Pharmacy Manual, "the arbitrator(s) shall decide any and all questions regarding *arbitrability* or

the formation, scope, *validity*, and/or interpretation of the parties' agreement to arbitrate." (*See, e.g.*, ECF No. 12-16 § L (emphasis added).) Challenges to the unconscionability of a contract—rather than a specific provision—concern the validity of the contract as a whole. *See Rent-A-Center*, 561 U.S. at 69–70. Accordingly, the delegation clause supplies clear and unmistakable evidence that the parties intended to delegate threshold issues, including Plaintiff's unconscionability claims and the arbitrability of Plaintiff's claims, to an arbitrator.

Likewise, the Pharmacy Manual's incorporation of the American Arbitration Association ("AAA") rules further provides evidence of the parties' intent to delegate threshold issues of arbitrability. *See Waterfront*, 2026 WL 880157, at *9. Pursuant to the Manual, "arbitration shall be administered exclusively by the [AAA] in accordance with its Commercial Arbitration Rules and Mediation Procedures, as they may be amended from time-to-time." (ECF No. 12-16 § L.) The AAA rules expressly state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim." *See* AAA Rule R-7(a). This "reference to AAA rules 'satisfies the clear and unmistakable test.'" *Waterfront*, 2026 WL 880157, at *9 (quoting *House v. Rent-A-Ctr. Franchising Int'l, Inc.*, No. 3:16-06654, 2016 WL 7394552, at *6 (S.D. W. Va. Dec. 21, 2016)). Plaintiff's arguments fail to overcome the parties' clear and unmistakable delegation.

Plaintiff argues that the delegation clause, combined with the California choice of law clause, operates as an unenforceable prospective waiver of Plaintiff's substantive rights because California law does not mandate the same reimbursement scheme as the Act. (ECF No. 33-1 at 5–8.) The prospective waiver doctrine applies when "the choice-of-forum and choice-of-law

clause operated in tandem as a prospective waiver of a party's right to pursue statutory remedies." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985). Here, the arbitration agreement does not mandate arbitrators to apply California law. Instead, it states that the arbitrators "shall be bound by controlling law." (ECF No. 12-16 at 128.) Defendants do not argue that this language requires arbitrators to apply California law, (ECF No. 13 at 17), nor will the Court adopt such a liberal interpretation. At most, the arbitration agreement "merely changes how [Plaintiff's] rights will be processed." *See Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 654 (2022). Consequently, Plaintiff cannot prove that it waived its substantive rights by agreeing to arbitrate its claims.

Accordingly, the arbitrator must determine questions of arbitrability, including whether Plaintiff's claims fall within the scope of the arbitration agreement and any question of unconscionability.

1. Caremark's Motion to Compel

As a preliminary matter, Caremark first argues that Arizona law governs the determination of whether Plaintiff's claims must be arbitrated. (ECF No. 15 at 8 n.3.) Next, Caremark argues that all four *Adkins* elements are met. (*Id.* at 6–11.) Finally, Caremark argues that the arbitration agreement delegates threshold issues of arbitrability, including unconscionability and scope, to an arbitrator. (*Id.* at 11–17.) Using the same arguments it used against Optum, Plaintiff argues that the delegation provision is unenforceable because, combined with the choice of law provision, "(1) it operates as a prospective waiver of [Plaintiff's] substantive West Virginia statutory rights; (2) is contained in illegal contracts that violate West Virginia public policy; (3) it violates West Virginia

public policy; and (4) it is procedurally and substantively unconscionable." (ECF No. 33-2 at 5.) For the reasons discussed below, the Court agrees with Caremark.

*i. Choice of Law*

As discussed above, a choice of law provision is valid and enforceable "(1) unless the provision bears no substantial relationship to the chosen jurisdiction or (2) the application of the laws of the chosen jurisdiction would offend the public policy of this State." *Blankenship*, 749 S.E.2d at 336.

Here, the choice of law provision contained in the PNA states, "[u]nless otherwise mandated by applicable Law, the agreement will be construed, governed, and enforced in accordance with the laws of the State of Arizona without regard to choice of law provisions." (ECF No. 16-2 at 2, ¶ 13.) The PNA bears a substantial relationship to Arizona because Providers, like Plaintiff, were directed to communicate with and notify Caremark in writing using Caremark's Arizona address. (ECF No. 14-3, at 3, 7, 23, 28, 41, 45.) Further, applying Arizona law does not offend the public policy of West Virginia because the WVSCA already determined that a similar agreement between Caremark and another plaintiff pharmacy bears a substantial relationship to Arizona *and* does not offend public policy. *See McDowell*, 796 S.E.2d at 580. Thus, Arizona law applies to this Court's determination of whether the parties are bound by a valid arbitration agreement.[7]

[7] As with this Court's evaluation of the choice of law provision between Plaintiff and Optum, the Court *only* finds that Arizona law applies to this Court's determination of the *enforceability* of the arbitration agreement. The Court makes no findings as to whether Arizona law applies to the arbitrator's determination of Plaintiff's claims.

*ii. The* Adkins *Elements*

Only the second *Adkins* element is in dispute, which requires Caremark to prove the existence of "a written agreement that includes an arbitration provision which purports to cover the dispute." *Adkins*, 303 F.3d at 500-01; *see also* ECF No. 33-1 at 3; ECF No. 15 at 7. Caremark argues that the second element is satisfied under the doctrines of incorporation by reference and contract modification. (ECF No. 15 at 7–11.)

Under Arizona law, "to incorporate by reference[,] the reference must be clear and unequivocal and must be called to the attention of the other party, he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *United Cal. Bank v. Prudential Ins. Co. of America*, 681 P.2d 390, 420 (Ariz. Ct. App. 1983) (quoting 17A C.J.S. *Contracts* § 299 at 136 (1963)); *see also Waterfront*, 2026 WL 880157, at *4. Specifically, "the incorporating instrument must clearly evidence an intent that the writing be made part of the contract." *United Cal. Bank*, 681 P.2d at 410.

"[T]o effectively modify a contract, . . . there must be: (1) an offer to modify the contract, (2) assent to or acceptance of that offer, and (3) consideration.'" *Demasse v. ITT Corp.*, 984 P.2d 1138, 1144 (Ariz. 1999). A party can acquiesce to a modification through conduct, such as continued use following notification of a modification. *Waterfront*, 2026 WL 880157, at *5; *see also Cap. One Bank (USA), N.A. v. Davey*, No. 1 CA-CV 13-0109, 2013 WL 6729261, at *5 (Ariz. Ct. App. Dec. 19, 2013); *McDowell*, 796 S.E.2d at 584.

Here, Plaintiff entered a PNA with Caremark directly in 2014, without the assistance of a PSAO. (ECF No. 16-2 at 3; ECF No. 14-1 at 2, ¶ 7.) Pursuant to the PNA, "[t]his agreement, the Provider Manual, and all other Caremark Documents constitute the entire agreement between

[Plaintiff] and Caremark, all of which are incorporated by this reference as if fully set forth herein[.]" (ECF No. 16-2 at 2, ¶ 11.) As such, the PNA clearly and unequivocally calls attention to the Provider Manual. Likewise, by signing the agreement, Plaintiff expressly consented to the terms of the PNA and acknowledged receipt of the Provider Manual. (*Id.* at 3.) Thus, the PNA incorporates by reference the terms of the Provider Manual. One of these terms is the amendment provision.

As per a provision in the 2014 Provider Manual, Caremark could make amendments to the Provider Manual "by giving notice to [Plaintiff] of the terms of the amendment and specifying the date the amendment becomes effective." (ECF No. 14-3 at 95.) According to that provision, if Plaintiff "submits claims to Caremark after the effective date of any notice or amendment, the terms of the notice or amendment is accepted by [Plaintiff] and is considered part of the Provider Agreement." (*Id.*) Consistent with this provision, on October 3, 2023, Caremark gave Plaintiff notice of the amended 2024 version of the Provider Manual which would go into effect starting January 1, 2024. (ECF No. 14-1, at 4 ¶ 15.) The 2024 version of the Provider Manual contained the following arbitration provision,

> [a]ny dispute, claim or controversy between [Plaintiff] and Caremark . . . including, but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to [Plaintiff's] participation in one or more Caremark networks or exclusion from any Caremark networks, including any disputes regarding the interpretation, validity, scope, or applicability of this agreement to arbitrate, will be exclusively settled by arbitration

(ECF No. 14-4 at 95.) Following the effective date, Plaintiff submitted "numerous claims" to Caremark. (*Id.*) Consequently, Plaintiff manifested assent to the terms of the 2024 Provider Manual—including the arbitration provision—by submitting claims to Caremark after the 2024 version of the Provider Manual went into effect. *See Waterfront*, 2026 WL 880157, at *5. Thus,

the arbitration agreement within the Pharmacy Manual is incorporated by reference into the PNA and enforceable against Plaintiff. *See id.*; *see also McDowell*, 796 S.E.2d at 585.

*iii. The Scope of the Arbitration Agreement*

Caremark argues that the Provider Manual delegates all issues of arbitrability to an arbitrator through an express delegation clause and incorporation of JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"). (ECF No. 15 at 12–14.)

As previously discussed, parties can agree to delegate "gateway" issues of arbitrability, including the unconscionability of the entire agreement and whether the parties agreed to arbitrate the matter. *Rent-A-Center*, 561 U.S. at 69–70. These gateway issues must be delegated by the parties by clear and unmistakable evidence. *Henry Schein*, 586 U.S. at 69 (2019).

Here, yet again, Plaintiff's unconscionability claims challenge the whole agreement, as opposed to the specific arbitration agreement. According to the delegation clause in the Provider Manual, "[t]he arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, *enforceability* or formation of the agreement to arbitrate, including, but not limited to any claim that all or part of the agreement to arbitrate is *void or voidable* for any reason." (ECF No. 14-4 at 95 (emphasis added).) The clause further specifies that "any disputes regarding the interpretation, validity, scope, or applicability of this agreement to arbitrate, will be exclusively settled by arbitration." (*Id.*) "[A] claim of unconscionability is a challenge to the contract's enforceability." *Waterfront*, 2026 WL 880157, at *6. As shown by the language in the delegation clause, there is clear and unmistakable evidence that the parties intended to delegate the unconscionability of the contract and the arbitrability of Plaintiff's claims to an arbitrator. *Id.*

Moreover, "the explicit incorporation of JAMS Rules serves as 'clear and unmistakable' evidence of the parties' intent to arbitrate arbitrability." *Waterfront*, 2026 WL 880157, at *6 (citing *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 528 (4th Cir. 2017)). Here, pursuant to the Manual, "the arbitration shall be administered by JAMS pursuant to its then applicable [JAMS Rules] including the rule governing Emergency Relief Procedures (available from JAMS)." (ECF No. 14-4 at 95.) Thus, the Provider Manual's incorporation of the JAMS Rules "provides an additional basis for referring any issues of arbitrability to the arbitrator." *See Waterfront*, 2026 WL 880157, at *6.

Accordingly, arbitrators must decide the threshold issues of arbitrability including the arbitrability of Plaintiff's claims and the unconscionability of the parties' agreement. *See id.* at *5.

***B. Express Scripts' Motion to Transfer and Sever Claims***

Express Scripts first argues that the Court should transfer Plaintiff's claims against it to the United States District Court for the Eastern District of Missouri because the parties agreed to two mandatory forum selection clauses. (ECF No. 29 at 5–14.) Then, Express Scripts argues that the Court should sever Plaintiff's claims against Express Scripts. (*Id.* at 14–15.) Conversely, Plaintiff argues the forum selection clauses are unenforceable under the prospective waiver doctrine, and because they are contracts of adhesion and unreasonable. (ECF No. 40-1 at 3–19.) The Court is not persuaded by Plaintiff's arguments.

1. <u>Transfer of Claims</u>

28 U.S.C. § 1404(a) "governs the District Court's decision whether to give effect to the parties' forum-selection clause." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 32 (1988).

Pursuant to this statute, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). The decision to transfer a matter to another district court is within the "sound discretion" of the district court. *AFA Enters. v. American States Ins. Co.*, 842 F. Supp. 902, 908 (S.D. W. Va. 1994).

Here, Express Scripts relies on two choice of law clauses. The first clause is contained in a Pharmacy Provider Agreement ("PPA") between Plaintiff and Express Scripts. (ECF No. 28-1 at 133.) According to that clause, "[a]ll litigation between the parties arising out of or related in any way to the interpretation or performance of the Agreement shall be litigated in the U.S. District Court for the Eastern District of Missouri[.]" (*Id.* at 10, § 7.12.) Next, the PPA incorporates by reference the Provider Manual, which contains the second, almost identical choice of law clause. (*Id.* at 9, § 7.3 ("This Agreement, including its . . . *Provider Manual* . . . constitutes the entire agreement of the parties with respect to the subject matter herein[.]" (emphasis added)); *see also Waterfront*, 2026 WL 880157, at *10. Pursuant to the clause in the Provider Manual, "[a]ll litigation between the parties arising out of or related in any way to the interpretation or performance of the Provider Agreement shall be litigated in the U.S. District Court for the Eastern District of Missouri[.]" (ECF No. 28-1 at 133, ¶ 2.)

The language in these forum selection clauses clearly covers Plaintiff's claims. Plaintiff's claims relate to the performance of the Contract, as Plaintiff alleges that Express Scripts used the Contract to reimburse Plaintiff in amounts that violated West Virginia law. (*See generally* ECF No. 38-1); *see also Waterfront*, 2026 WL 880157, at *11.

Having found that these clauses cover Plaintiff's claims, the Court must next determine if these forum selection clauses are mandatory or permissive.

*i. Mandatory vs. Permissive Choice of Law Clauses*

Before conducting a § 1404(a) analysis, the Court must initially determine if the forum selection clauses at issue are mandatory or permissive. Express Scripts argues that the clauses are mandatory. (*See generally* ECF No. 29.) As discussed below, the Court agrees.

If the forum selection clauses are merely permissive, as opposed to mandatory, the traditional 1404(a) analysis applies. *See BAE Sys. Tech. Sol. & Servs. Inc., v. Republic of Korea's Def. Acquisition Program Admin*., 884 F.3d 463, 471–72 (4th Cir. 2018). Conversely, if the forum selection clauses are permissive, the modified *Atlantic Marine*[8] analysis applies. A federal court generally applies federal law to determine if a forum selection clause is mandatory or permissive. *Albemarle Corp.*, 628 F.3d at 650. If, however, the agreement includes a choice of law provision, the forum selection clause must be interpreted as mandatory or permissive in the "context" of the choice of law provision. *Id.* at 651; *see also Perry-Horbal v. Adventure W. Va. Resort, LLC*, 2:26-cv-00230, 2026 WL 2322097, at *3 (S.D. W. Va. Aug. 11, 2026) (Berger, J.) (citing cases); *Barnhart v. Cornerstone Bldg. Brand Servs.*, No. 2:25-cv-00613, 2026 WL 2151676, at *5 (S.D. W. Va. July 27, 2026) (Goodwin, J.).

As previously discussed, the court should enforce a choice of law provision "(1) unless the provision bears no substantial relationship to the chosen jurisdiction or (2) the application of the laws of the chosen jurisdiction would offend the public policy of this State." *Blankenship*, 749 S.E.2d at 336. Here, the PPA contains a choice of law provision mandating that the

[8] *Atlantic Marine Construction Corporation. v. United States District Court*, 571 U.S. 49, 63 (2013).

agreement "shall be construed and governed in all respects according to the internal laws in the state of Missouri, without regard to conflict of law principles." (ECF No. 28-1 at 20.) The PPA bears a substantial relationship to Missouri because Express Scripts' principal place of business is in Missouri. (ECF No. 38-1 at 2, ¶ 3.) Further, applying Missouri law does not offend the public policy of West Virginia because, as discussed below, the outcome would be the same under West Virginia law. Thus, Missouri law applies to this Court's determination of whether the parties are bound by a valid arbitration agreement.[9]

Under the law of Missouri, "the word 'shall' indicates a mandatory duty to abide by that agreement." *Opioid Master Disbursement Tr. II v. Ace Am. Ins.*, 688 S.W.3d 690, 695 (Mo. Ct. App. 2024); *see also Weber v. Moerschel*, 313 S.W.3d 220, 224 (Mo. Ct. App. 2010) (finding the use of "shall" in a contract is "compulsory"). Notably, applying West Virginia law produces the same result because the WVSCA has held that "[i]f jurisdiction is specified with mandatory terms such as 'shall,' . . . the clause will be enforced as a mandatory forum-selection clause." *Caperton v. A.T. Massey Coal Co.*, 690 S.E.2d 322, 339 (W. Va. 2009). Here, the forum selection clauses are mandatory because they mandate that "[a]ll litigation . . . *shall* be litigated in the U.S. District Court for the Eastern District of Missouri." (ECF No. 28-1 at 10, § 7.12; *Id.* at 133, ¶ 2 (emphasis added).); *see also Waterfront*, 2026 WL 880157, at *11–13. Consequently, the *Atlantic Marine* analysis applies.

---

[9] Again, the Court determines *only* that Missouri law applies with respect to whether the choice of forum provision is mandatory or permissive. The Court makes no finding as to whether the Missouri law should be applied in other contexts.

*ii. The* Atlantic Marine *Analysis*

Express Scripts argues that the clauses are enforceable under the modified *Atlantic Marine* analysis. (*See generally* ECF No. 29.) The Court agrees.

Typically, in accordance with the traditional 1404(a) analysis, the district court weighs the following factors in deciding a defendant's motion to transfer: "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015). However, under *Atlantic Marine*, the presence of a valid forum selection clause "requires district courts to adjust their usual § 1404(a) analysis in three ways." 571 U.S. at 63.

First, the plaintiff's choice of venue bears no weight. *Id.* Rather, the plaintiff bears the burden of showing that enforcing the forum selection clause is "unwarranted." *Id.* Second, the district court "should not consider . . . the parties' private interests[;]" it may only consider "public-interest factors[.]" *Id.* at 64. Public interest factors include, "the administrative difficulties flowing from court congestion," (2) "the local interest in having localized controversies decided at home," and (3) "the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6 (internal quotation marks omitted). These factors "rarely" defeat a motion to transfer, so "the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64. Lastly, "[t]he court in the contractually selected venue should not apply the law of the transferor venue to which the parties waived their right." *Id.* at 65–66.

Here, Plaintiff's arguments fall under the second and third factors, as it argues that West Virginia has an interest in adjudicating Plaintiff's claims.[10] (ECF No. 40-1 at 25.) Yet these factors weigh neutrally at best. Starting with the first factor, both West Virginia and Missouri have an interest in resolving this case. West Virginia has an interest because Plaintiff is incorporated and operates in West Virginia, and its claims involve West Virginia law. Still, Missouri also has an interest because Express Scripts has its principal place of business in Missouri and if the Missouri choice of law provision is enforced, then Missouri law would govern the litigation. *Waterfront*, 2026 WL 880157, at *12. Turning to the second factor, Plaintiff offers no reason for this Court to doubt the chosen forum's ability to apply West Virginia law. In fact, "[f]ederal courts sitting in diversity regularly apply other states' laws, and there is no reason that a federal court sitting in Missouri cannot do so." *Id.* Thus, Plaintiff fails to raise any "exceptional" reasons why the public interest would be better served by not enforcing the forum selection clauses. *See Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 211 (4th Cir. 2022).

Finally, all of Plaintiff's arguments against transfer fail.

Plaintiff argues that the contracts it entered with Express Scripts are contracts of adhesion and procedurally and substantively unconscionable. (ECF No. 40-1 at 8–13.) Plaintiff asserts procedural unconscionability because Express Scripts presented the contracts on a "take it or leave it" basis. (ECF No. 40-1 at 9–11.) Yet, Plaintiff is an experienced pharmaceutical company that has operated its business since 1952, (ECF No. 38-1 at 3, ¶ 10), and it cannot show that a "gross

[10] Plaintiff also attempts to argue that the public interest in judicial economy weighs against enforcement of the clauses, asserting that denying enforcement avoids parallel litigation in this Court and in Missouri. (ECF No. 40-1 at 23.) These arguments fall short because the Court is transferring all of Plaintiff's claims against Express Scripts to the Eastern District of Missouri and will not have anything further to resolve upon transfer. Also, this case will be stayed pending the arbitration of Plaintiff's remaining claims.

inadequacy in bargaining power" existed. *Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749, 753 (W. Va. 1986) (internal citation and quotation marks omitted).

Next, Plaintiff argues substantive unconscionability applies because the contract contains a waiver clause which does not allow Plaintiff to bring class action claims or claim consolidation. (*Id.* at 11–13.) The Court is not persuaded. Plaintiff entered the contract voluntarily and "ignorance due to failure to read is no excuse[.]" *Mercury Coal & Coke, Inc. v. Mannesmann Pipe & Steel Corp.*, 696 F.2d 315, 318 (4th Cir. 1982). Moreover, "attacking the underlying validity of a contract is an insufficient basis for rejecting an otherwise valid forum-selection clause." *Williams v. MJC Acquisition, LLC*, No. 3:19-0643, 2020 WL 597464, at *3 (S.D. W. Va. Feb. 6, 2020) (Chambers, J.).

Lastly, Plaintiff argues that the prospective waiver doctrine invalidates the forum selection clauses because the forum selection clauses and choice of law provision "operate in tandem" to waive statutory remedies. (ECF No. 40-1 at 3–8.) This is not the case. Enforcement of the clauses does not result in a "complete waiver of statutory remedies[,]" instead, the clauses "merely designate the forum, which is permissible." *Waterfront*, 2026 WL 880157, at *12.

Accordingly, Plaintiff's claims against Express Script should be transferred to the Eastern District of Missouri.

2. <u>Severance of Claims</u>

Express Scripts argues that this Court should sever the claims against it because the contract between it and Plaintiff does not allow claims to be consolidated with another party and because severance would effectuate transfer. (ECF No. 29 at 14–15.)

"On motion or on its own, the court may at any time . . . sever any claim against a party." Fed. R. Civ. P. 21. "The district court has broad discretion in determining whether to sever a claim under Rule 21." *Waterfront*, 2026 WL 880157, at *13 (citation and internal quotation marks omitted). Here, the Provider Manual states that "[t]he parties agree that Claims shall not be consolidated or coordinated in any action with the Claim of any other individual or entity . . . [and], no Claim or other dispute may be litigated on a coordinated, class, mass, or consolidated basis[.]" (ECF No. 28-1 at 133.) In accordance with this provision, and to effectuate transfer to the Easten District of Missouri, the Court finds that severance is appropriate.[11] *Waterfront*, 2026 WL 880157, at *13.

## *IV. CONCLUSION*

Thus, for the reasons discussed above, the motions to compel arbitration are **GRANTED**. (ECF Nos. 12, 14.) Plaintiff, Optum, and Caremark are hereby **ORDERED** to arbitrate this matter. Further, the motion by Express Scripts to sever and transfer is **GRANTED** and the claims against Express Scripts are **SEVERED** and **TRANSFERRED** to the United States District Court for the Eastern District of Missouri. (ECF No. 28.) The Court **STAYS GENERALLY** this case pending arbitration and **DIRECTS** the Clerk to **REMOVE** this case from the active docket of the Court.

[11] In addition to its motion to transfer and sever claims, (ECF No. 28), Express Scripts filed a motion to dismiss Plaintiff's complaint, and alternatively, strike class claims, (ECF No. 26). Because the motion to transfer is granted, the Court will not decide these pending motions.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: September 28, 2026

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE